UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

EDWARD J. WINTERS, III,             )
      Plaintiff,                    )
                                    )
                                    )
      v.                            )       C.A. No. 20-11937-MLW
                                    )
LIBERTY LIFE ASSURANCE              )
COMPANY OF BOSTON N/K/A             )
LINCOLN LIFE ASSURANCE             )
COMPANY OF BOSTON,                  )
      Defendant.                    )

MEMORANDUM AND ORDER

WOLF, D.J.                                    October 6, 2022

I.    INTRODUCTION

     Plaintiff Edward J. Winters, III has sued defendant Liberty

Life Assurance Company of Boston ("Liberty")[1] to recover benefits

denied to him under §502 of the Employee Retirement Income Security

Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B). Winters filed a

motion for summary judgment, and Liberty filed a motion for

judgment on the administrative record. Winters also filed a motion

to strike two exhibits that Liberty submitted in support of its

statement of material facts.

---

[1] Liberty now operates under the name Lincoln Life Assurance
Company of Boston. The relevant filings refer to the defendant as
both "Liberty" and "Lincoln."

As explained below, the motion to strike is not meritorious. The court finds that the exhibits do not impermissibly expand the administrative record because they include a summary of information included in the record and a declaration necessitated by Winters' claim of procedural bias.

The court has reviewed Liberty's decision to terminate Winters' long-term disability benefits under the arbitrary and capricious standard. This standard is not altered by state law or Winters' claims of procedural error. To the extent, if any, that Liberty committed any procedural error, Winters has failed to prove any resulting prejudice. Under the arbitrary and capricious standard, the court finds that Liberty's decision to terminate benefits was based on substantial evidence but was unreasonable based on the record before it because Liberty did not complete an assessment of whether Winters was able to carry out all of the Material and Substantial Duties of his Own Occupation as defined by the relevant disability plan. Rather, Liberty made a determination that Winters could perform sedentary or light physical work.

Therefore, the court is denying Winters' motion to strike, denying Winters' motion for summary judgment, denying Liberty's motion for judgment on the administrative record, and remanding the case to Liberty for further consideration.

2

II.   BACKGROUND

Winters was a mortgage consultant at Wells Fargo & Company ("Wells Fargo"). See Compl. (Dkt. No. 1) ¶6. As an employee, he participated in Wells Fargo's Long-Term Disability Plan (the "LTD Plan"), which was administered by Liberty. Id. ¶¶2, 7. The LTD Plan is an ERISA-governed welfare-benefit plan. Id. ¶2.

Information concerning the LTD Plan is in the more than 4,400-page administrative record filed under seal at Dkt. Nos. 22-24. The LTD Plan defines "Disability" or "Disabled" to mean:

> i. that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and
>
> ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

Administrative Record ("AR") at 4345. The Elimination Period is 26 weeks and begins on the first day of Disability. AR at 4341, 4346. "Sickness" is defined as "illness, disease, pregnancy or complications of pregnancy." AR at 4352. "Material and Substantial Duties" are "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." AR at 4348. "Own Occupation" means "the Covered Person's occupation that he was performing when his Disability or Partial Disability

began . . . as it is normally performed in the local economy." AR
at 4349.

Winters' date of disability was January 24, 2018. AR at 59.
He satisfied the 26-week Elimination Period on July 25, 2018. Id.
Twenty-four months following the Elimination Period was July 25,
2020. Winters' benefits were terminated on October 29, 2019. AR at
3005-18. Therefore, Winters was within the first 24 months of
Disability at the time his benefits were terminated. Accordingly,
the relevant question is whether he was able to perform the
Material and Substantial Duties of his Own Occupation. See AR at
4345.

The LTD Plan provides that "Liberty shall possess the
authority to construe the terms of this policy and to determine
benefit eligibility hereunder." AR at 4375. For long term
disability coverage, "Proof that a Covered Person is Disabled due
to Injury or Sickness and requires the Regular Attendance of a
Physician . . . must be given upon Liberty's request and at the
Covered Person's expense." AR at 4359. The covered person must
also provide proof of continued "Appropriate Available Treatment."
Id. The LTD Plan provides that "[i]n determining whether the
Covered Person is Disabled, Liberty will not consider employment
factors including, but not limited to, interpersonal conflict in
the workplace, recession, job obsolescence, paycuts, job sharing
and loss of a professional or occupational license or

4

certification." Id. The LTD Plan is governed by Minnesota law. AR at 4338.

The LTD Plan became effective on January 1, 2010. AR at 4385. It has been amended several times, most recently and most pertinently by Amendment No. 4 in September 2016. AR at 1990-94. Amendment No. 4 revises the Survivor Benefit for Disabilities and Partial Disabilities which start on or after its effective date, January 1, 2016. AR at 1990. It states that "[t]his policy's terms and provisions will apply other than as stated in this amendment." Id.

In early 2018, while still employed at Wells Fargo, Winters stopped working because of "headaches, dizziness, tremor, low back pain, knee pain, joint pain, fatigue, soreness, and cervical and lumbar pain." Compl. ¶15. Winters asserted that he suffered from Lyme disease, see, e.g., id., although he has never been given that diagnosis, see, e.g., AR at 413-16. Winters claims that his work capacity is also limited by difficulty driving and looking at computer screens. See, e.g., AR at 1867. The administrative record also makes references to Winters' cognitive complaints, such as memory loss, anxiety, and reactive emotions. See, e.g., AR at 90, 1167.

Winters filed a claim for short-term disability benefits on January 10, 2018. See AR at 2, 50. Winters' request for short-term disability benefits was approved, AR at 2065, and benefits were

5

extended through July 24, 2018, AR at 3988, 3992, 4070, 4186. Winters applied for and initially received long-term disability benefits based on a determination that he was "disabled by symptoms of headaches, dizzines [sic], joint pain, and fatigue" and unable to perform the duties of his occupation. AR at 3520-23.

On October 29, 2019, Liberty terminated Winters' long-term disability benefits because it determined that Winters had sedentary work capacity. AR at 3005-18. This decision was based on medical peer reviews of Winters' medical records performed by four physicians, an independent medical examination ("IME") of Winters, and an occupational analysis performed by a vocational counselor. See id.

The IME was performed by physiatrist Dr. Neil Patel who found that Winters "does have sustained sedentary work capacity to perform his own occupation as a Mortgage Consultant and is able to meet the demand levels outlined in the job description provided."[2]

---

[2] The Wells Fargo mortgage consultant job description states:

> Responsible for soliciting residential mortgages from various sources including realtors, builders, financial professionals, past customers and other nontraditional sources; produces high quality loans which meet WFHM guidelines while providing excellent customer service. This position requires compliance with the S.A.F.E. Mortgage Licensing Act of 2008 and all related regulations. Ongoing employment is contingent upon meeting all such requirements, including acceptable background investigation results.

AR at 3174-84. Liberty sent this assessment to Winters' treating physicians, including his primary care physician Dr. Joseph DeLuca. See AR at 3033-35. In response to a letter dated October 3, 2019, Dr. DeLuca checked the line that stated that he agreed with Dr. Patel's "assessment and findings," including the conclusion that "[t]he claimant does have sustained sedentary work capacity to perform his own occupation as a Mortgage Consultant and is able to meet the demand levels outlined in the job description provided." Id. Winters' rheumatologist Dr. Betty Hsiao responded that she could not comment because she only saw Winters once. AR at 3063-64. His neurologist Dr. Sirisha Sanamandra did not respond. See AR at 2982.

Winters had 180 days, until at least April 27, 2020,[3] to appeal Liberty's decision. See AR at 4429. On March 25, 2020, Winters requested a 90-day extension because of difficulties gathering medical records as a result of the COVID-19 pandemic. AR at 1959-60. In a letter dated April 18, 2020, Liberty granted a

_____

AR at 4066.

[3] The LTD Plan states that a claimant has 180 days following the receipt of notice of an adverse determination to file an appeal. AR at 4429. While Liberty terminated benefits on October 29, 2018, the letter notifying Winters was dated October 30, 2018. AR at 3005. There is no allegation about when Winters actually received notice, but the administrative record indicates that both Winters and Liberty were using April 27, 2020 as the original deadline. See AR at 1959, 2968. But see AR at 1961 & n.1. In any event, the exact deadline is not material to the court's decision.

45-day extension, until June 10, 2020. AR at 2968. Winters states that he did not receive the letter until May 11, 2020, see Compl. ¶42, and filed an appeal of the termination on April 20, 2020, see AR 1961-70.

Winters' claim of disability is chiefly supported by Dr. DeLuca. Dr. DeLuca opined in 2018 that Winters was "unable to work." AR at 3727. On December 9, 2019, after agreeing with Dr. Patel that Winters could perform the functions of a Mortgage Consultant, Dr. DeLuca stated that Winters "is currently not able to drive for work" and "is thoroughly disabled." AR at 1876. On March 3, 2020, Dr. DeLuca wrote that he did not "believe [Winters] should be driving or working as he is [sic] steadily deteriorated over this period of time." AR at 1867.

Although Dr. DeLuca does not explain why he initially agreed with Dr. Patel that Winters could perform the functions of a Mortgage Consultant and reversed his opinion two months later, it appears that Dr. DeLuca was relying, at least in part, on his opinion that Winters could not drive. AR at 1867, 1876. However, a September 2020 labor market survey commissioned by Liberty and conducted by Paradigm Complex Care Solutions ("Paradigm") found that the duties of a Mortgage Consultant do not include driving. See AR at 74-77. More specifically, Paradigm surveyed 10 local employers, and found that 80 percent of jobs in the occupation of

8

"Sales Representative, Financial Services"[4] were sedentary, and most employers did not require driving as an occupational duty. AR at 74-80.

Winters notes that Dr. Sanamandra found that his ability to work was limited based on the assumption that driving was a requirement of his occupation. See AR at 3590. In addition, he relies on his chiropractor, Dr. Robert Porzio, who opined that Winters had "debilitating" symptoms and that "his ability to work and live a normal lifestyle has significantly declined," AR at 1958, without linking his opinion to the job requirements of a Mortgage Consultant, id.

Winters supplemented his appeal on June 10, 2020. AR at 845-923. This supplemental information was reviewed by one of Liberty's doctors, who reported that it did not alter his prior opinion that Winters was able to work. See AR at 153-54.

On July 1, 2020, Winters supplemented his submission again. AR at 98-113. On the same day, Liberty provided Winters with a copy of peer reviews performed during the appeal and asked him to provide a response with any additional documentation he wanted to be considered by July 24, 2020. AR at 131-54. In a July 24, 2020

---

[4] Liberty's vocational expert found that the job of Mortgage Consultant most closely aligned with the occupation of "Securities, Commodities, and Financial Services Sales Agents." AR at 3014-15.

9

letter, Winters asserted that the peer reviews were deficient because they did not consider his supplemental submissions and did not sufficiently support the conclusion that he was unable to perform his job duties. AR at 92-94. However, the June 18, 2020 review produced to Winters explicitly notes that a doctor reviewed his first supplemental submission. See AR at 151.

Following receipt of Winters' letter, Liberty sent the second supplement to two physicians to consider. See AR at 87-88, 89-91. The doctors concluded that this information did not alter their prior opinions that Winters was able to work. See id. Liberty also engaged another vocational expert who concluded that a labor market survey should be conducted. See AR at 4-5. A labor market survey was done in September 2020. See AR at 74-80.

On October 13, 2020, Liberty denied Winters' appeal. AR at 59-73. This decision was based in part on reviews of Winters' medical records performed by four additional physicians. See AR at 63-69. Gastroenterologist Dr. David Yamini performed a review on May 19, 2020, concluding that Winters "is not functionally limited for the time period under review" and that "activity restrictions and limitations are not medically supported or necessary." AR at 1204-13. Clinical neuropsychologist Dr. Robert Shura performed a review on May 23, 2020, AR at 1186-1203, which was updated to consider Winters' supplemental submissions on July 30, 2020, AR at 89-91. Dr. Shura concluded that "there is no medical evidence of

10

significant cognitive or psychiatric impairment to warrant [restrictions and limitations]." AR at 89. Psychiatrist Dr. Amy Feitelson performed a review on June 1, 2020, concluding that Winters' "reported symptoms do not preclude functioning at work and do not translate into restrictions and limitations beyond 10/29/19." AR at 1167-83. Physiatrist Dr. Paras Mehta performed a review on June 2, 2020, AR at 1159-66, which was updated to consider Winters' supplemental submissions on June 18 and August 7, 2020, AR at 151-52, 87-88. Dr. Mehta concluded that "[t]here is nothing in the available medical records to suggest inability to perform full-time work within [specified] restrictions and limitations." AR at 88.

On May 14, 2020, Dr. Yamini spoke with Dr. DeLuca who said that he was "not able to clearly address the claimant's functional status." AR at 1211, 1213. However, on June 2, 2020, someone in Dr. DeLuca's office told Dr. Mehta that Dr. DeLuca had sent a May 26, 2020 letter "indicating [that] he did not see how any accommodations could be made to allow [Winters] to work considering his many [symptoms]." AR at 1160-61. Dr. Shura spoke with Dr. Hsiao who indicated that there were "no problems to address from a rheumatological standpoint." See AR at 1194.

Liberty's denial was also based in part on the labor market survey conducted by Paradigm in September 2020, AR at 69-70, 74-80, which found that 80 percent of jobs for the occupation of

11

"Sales Representative, Financial Services" were sedentary, AR at 74-77, 80, and that there was no driving requirement for the occupation, id.

Winters claims that Liberty did not disclose the May 23, June 1, July 30, and August 7, 2020 medical reviews or the labor market survey to him before denying his appeal. See Pl. Statement of Material Facts (Dkt. No. 27) ¶¶114, 115; see also AR at 131 (letter from Liberty to Winters listing only the May 19, June 2, and June 18 reviews as enclosures). Liberty does not dispute this contention. Rather, it argues that disclosure of these items was not necessary. See Def. Resp. to Pl. Statement of Material Facts (Dkt. No. 38) ¶¶114, 115.

III. PROCEDURAL HISTORY

Winters filed this case on October 28, 2020, seeking to recover benefits denied to him plus interest and attorneys' fees. See Compl. (Dkt. No. 1) at 9-11. He is also seeking injunctive relief declaring his rights to past and future benefits and an order prohibiting Liberty from using offsets in the LTD Plan. Id. at 11. In the alternative, he asks this court to remand the benefit denial to Liberty to be decided again. Id. On December 18, 2020, Liberty responded arguing, among other things, that Winters had failed to state a claim for which relief could be granted. See Answer (Dkt. No. 9) at 8.

12

On May 18, 2021, Winters filed a motion for summary judgment (Dkt. Nos. 25, 26), and a statement of material facts (Dkt. No. 27). Winters argues that Liberty's decision should be reviewed de novo. See Pl. Mem. (Dkt. No. 26) at 6-9. He alleges that Liberty committed procedural error because it was delayed in approving his request for an extension in submitting his appeal, conducted some medical reviews before all of his records were received, and did not disclose all materials it considered prior to denying his appeal. Id. at 8-9. Winters points to evidence in the administrative record detailing his symptoms and argues that Dr. DeLuca has repeatedly opined that he is disabled. Id. at 9-12. He contends that Liberty did not give sufficient weight to his subjective complaints and instead improperly focused on the lack of a unifying diagnosis. Id. at 18; Pl. Opp'n (Dkt. No. 34) at 8-11. He also argues that the doctors Liberty relied on did not properly consider all of his relevant job duties, including cognitive demands. Pl. Mem. at 14-17. Finally, he argues that Liberty, as both the decisionmaker and payor of claims, has a structural conflict and that it has not taken steps to reduce the risk of bias. Id. at 19-20.

Also on May 18, 2021, Liberty filed a motion for judgment on the administrative record (Dkt. No. 29), and its statement of material facts (Dkt. No. 30). Liberty's statement of material facts includes two exhibits: a medical chronology (Dkt. No. 30-1) and a

13

declaration from Liberty's Director of Appeals, Richard Tom (Dkt. No. 30-2) (the "Tom Declaration"). Liberty argues that its decision should be reviewed under a deferential arbitrary and capricious standard. See Def. Mot. (Dkt. No. 29) at 4-6. It contends that Winters has not met his burden of proving disability under the LTD Plan, id. at 3-4, and that its decision to uphold the termination of Winters' benefits, informed by a total of nine independent physicians, an occupational analysis, and a labor market survey, was reasonable, see id. at 16-20.

On July 7, 2021, the parties filed oppositions to each other's motions. See Pl. Opp'n (Dkt. No. 34); Def. Opp'n (Dkt. No. 37). On the same day, Winters filed a motion to strike Liberty's exhibits, alleging that the exhibits impermissibly expand the administrative record and do not comply with the Federal Rules of Evidence. See Mot. to Strike (Dkt. No. 36). On August 3, 2021, Liberty filed an opposition to Winters' motion to strike. See Opp'n to Mot. to Strike (Dkt. No. 41).

IV. LEGAL STANDARD

Under §502 of ERISA, a participant in a welfare-benefit plan, like the LTD Plan, may bring a civil action "to recover benefits due to him under the terms of his plan." 29 U.S.C. §1132(a)(1)(B). Under any standard of review, a claimant seeking to recover disability benefits bears the burden of proving disability within the meaning of his plan. See, e.g., Orndorf v. Paul Revere Life

14

Ins. Co., 404 F.3d 510, 518-19 (1st Cir. 2005); Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 700 (1st Cir. 2007).

A court reviewing a denial of disability benefits may typically only consider the information already in the administrative record. See Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 23 (1st Cir. 2003). However, the court may consider other evidence if there is "some very good reason." Id. Additional evidence may be required based on the "nature or timing" of the claim. Id. For example, "a good reason has been found to exist when a party makes a colorable claim of bias." Denmark v. Liberty Life Assurance Co. of Boston, 566 F.3d 1, 10 (1st Cir. 2009).

V.    MOTION TO STRIKE

In his motion to strike, Winters argues that the medical chronology and the Tom Declaration submitted by Liberty should be stricken because they impermissibly expand the administrative record and do not comply with the Federal Rules of Evidence. For the reasons described below, the motion is not meritorious.

1. Medical Chronology

It is true that neither disputed exhibit is in the administrative record. However, the medical chronology provides a summary of information found in the record and includes helpful citations. Winters alleges that the medical chronology is "incomplete and misleading," and violates the Federal Rules of

15

Evidence requiring parties to submit original documents or certified copies. See Mot. to Strike (Dkt. No. 36) at 2. He identifies four specific entries in the chronology and challenges them as mischaracterizations of medical assessments. See id.

Liberty acknowledges that some of the entries in the chronology include citation errors and has submitted corrections. See Opp'n to Mot. to Strike (Dkt. No. 41) at 2. The corrected citations demonstrate that the entries Winters challenges as misleading are essentially identical to the information found in the administrative record.[5] Moreover, because the administrative record is over 4,400 pages, the medical chronology is a useful summary and may properly be considered.[6]

---

[5] For example, Winters argues that the August 10, 2011 entry of the medical chronology mischaracterizes information as "Chief Complaints." See Mot. to Strike at 2. This entry reads "Office Note - Chief Complaint: fatigue, weakness, cognitive difficulties," and cites to AR at 382. See Med. Chronology (Dkt. No. 30-1) at 5. In response, Liberty corrected the citation to AR at 380, which shows the words "Fatigue, weakness, cognitive difficulties" under the heading "Chief Complaint."

[6] If the court were deciding a motion for summary judgment, the facts to be considered would be limited to those that could be presented in a form that would be admissible at trial under the Federal Rules of Evidence. See Fed. R. Civ. P. 56(c)(2). The chronology at issue appears to satisfy this standard. However, although Winters styles his motion as a motion for summary judgment, it is actually, as Liberty recognizes, a motion for judgment on an administrative record, and the requirements for a motion for summary judgment do not apply. See Orndorf, 404 F.3d at 517; Liston, 330 F.3d at 24 & n.3; Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006).

## 2. The Tom Declaration

Although the Tom Declaration includes information not in the administrative record, Liberty has provided good reason for the court to consider it. The Tom Declaration provides information about how claims and appeals are processed at Liberty. This information is relevant because Winters alleges that Liberty, as both the decisionmaker and payor of claims, has a structural conflict of interest and argues Liberty has failed to take measures to reduce bias. This issue must be resolved because Winters claims that the court should apply a less deferential standard of review due to the alleged structural conflict. In addition, the administrative record was compiled for Liberty to assess whether Winters should receive disability benefits. It is understandable that it does not include information needed for Liberty to defend subsequent claims concerning the structural integrity of its processes. Therefore, Liberty has demonstrated good reason for including new evidence in the form of the Tom Declaration. See Liston, 330 F.3d at 23. Accordingly, the Tom Declaration survives Winters' contention that it is irrelevant because it discusses Liberty's procedural processes instead of the denial of Winters' benefits.

Winters also appears to be arguing that that the Tom Declaration would be inadmissible under Federal Rule of Evidence 403. However, he does not explain how the probative value of the

17

Declaration is substantially outweighed by unfair prejudice or any other danger provided by Rule 403 for exclusion of otherwise relevant, admissible evidence if, contrary to this court's conclusion, see supra n.6, the Federal Rules of Evidence apply here.

Finally, Winters argues that the Tom Declaration is not based on his personal knowledge. He reasons that Tom, as Director of Appeals, has not demonstrated sufficient knowledge of Liberty's claims department because it is independent from the appeals department. This argument is unpersuasive. Appeals necessarily involve consideration of underlying claims, and at times the manner in which they were decided. Tom has stated under oath that he has personal knowledge of the matters in his Declaration. See Tom Declaration ¶1. Winters does not provide any direct or meaningful evidence to doubt Tom's sworn statement. The court finds that that Tom, as the Director of Appeals, has a sufficient understanding of Liberty's claims department and related processes for his Declaration to be considered.

*       *       *

In essence, the court finds the chronology to be a useful summary of the record. It also finds that the Tom Declaration is relevant, reliable evidence necessitated by Winters' claims of procedural bias. These exhibits do not impermissibly expand the

18

administrative record. Therefore, the court is denying Winters'
motion to strike.

VI.   ANALYSIS

    1. <u>Standard of Review</u>

        a. <u>The Usual Standard</u>

As indicated earlier, the parties disagree on what standard
of review the court should apply in reviewing the administrative
record. Winters argues that <u>de novo</u> review is required while
Liberty asserts that a more deferential arbitrary and capricious
- or abuse of discretion – standard applies.[7]

The ERISA statute does not establish the "appropriate
standard of review for actions under §1132(a)(1)(B) challenging
benefit eligibility determinations." <u>Firestone Tire & Rubber Co.</u>
<u>v. Bruch</u>, 489 U.S. 101, 108-09 (1989). The Supreme Court has held
that the standard of review for these actions largely depends on
whether "the benefit plan gives the administrator or fiduciary
discretionary authority to determine eligibility for benefits or
to construe the terms of the plan." <u>Id.</u> at 115; see <u>also</u> <u>Leahy v.</u>
<u>Raytheon Co.</u>, 315 F.3d 11, 15 (1st Cir. 2002). If the "provisions
of the employee benefit plan . . . reflect a clear grant of
discretionary authority," courts apply a deferential arbitrary and

---

[7] "Arbitrary and capricious" and "abuse of discretion" are
synonymous in this context. <u>Ovist v. Unum Life Ins. Co. of Am.</u>, 14
F.4th 106, 117 n.9 (1st Cir. 2021).

capricious standard. See Leahy, 315 F.3d at 15; McGillivray v. Life Ins. Co. of N. Am., 519 F. Supp. 2d 157, 160 (D. Mass. 2007). If the plan does not clearly grant such authority, courts review these actions de novo. Firestone, 489 U.S. at 115.

The LTD Plan provides that "Liberty shall possess the authority to construe the terms of this policy and to determine benefit eligibility hereunder." AR at 4375. This is a clear grant of discretionary authority to Liberty that would typically warrant use of the deferential arbitrary and capricious standard.

### b. The Effect of Minnesota Law

Nevertheless, Winters argues that the LTD Plan is governed by Minnesota law and contends that Minnesota Statutes §60A.42 prohibits a grant of discretionary authority. Section 60A.42 states that:

> No policy, contract, certificate, or agreement offered or issued in this state providing for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract or provide a standard of review that is inconsistent with the laws of this state, or less favorable to the enrollee when a claim is denied than a preponderance of the evidence standard.

However, as Liberty correctly notes, §60A.42 became effective on January 1, 2016, and "applies to policies issued or renewed on or after that date." 2015 Minn. Sess. Law Serv. Ch. 59 (S.F. 997); see also Kaminski v. UNUM Life Ins. Co. of Am., 517 F. Supp. 3d 825, 853 (D. Minn. 2021).

20

An amendment to a plan or policy may constitute a renewal of the policy for purposes of §60A.42. See Kaminski, 517 F. Supp. 3d at 857. For example, in Kaminski the court found that a policy was in effect renewed by an "amendment" that stated: "The entire policy is replaced by the policy attached to this amendment." Id. at 855 (emphasis in original). However, it stated an amendment that creates a "limited, discrete change" does not constitute an issuance of a new policy or a renewal. See id. at 857. For example, in Barrett v. Life Insurance Co. of North America, the court found that, under a similar Illinois statute, an amendment changing a employee class definition in the policy at issue did not constitute an issuance or renewal of the policy. 2012 WL 3544839, at *2 (N.D. Ill. Aug. 16, 2012); see also Kaminski, 517 F. Supp. 3d at 856.

It is undisputed that the Liberty LTD Plan became effective in 2010, six years before the effective date of §60A.42 and eight years before Winters allegedly became disabled. However, Winters argues that §60A.42 is applicable because the LTD Plan was effectively renewed when it was amended by Amendment No. 4 in 2016. Amendment No. 4 revises the Survivor Benefit for Disabilities and Partial Disabilities which start on or after its effective date, January 1, 2016. See AR at 1990. It also states that "[t]his policy's terms and provisions will apply other than as stated in this amendment." Id. Amendment No. 4 is, therefore, only a "limited, discrete change" in the LTD Plan which is not relevant

21

to the issues in this case. Kaminski, 517 F. Supp. 3d at 857. It does not substantially replace the LTD Plan originally in effect concerning Winters. Cf. id. Therefore, the court does not find that Amendment No. 4 constitutes a "renewal" of the LTD Plan for the purposes of §60A.42. Accordingly, Minnesota law does not alter the conclusion that the court must decide whether Liberty's decision concerning Winters' claim was arbitrary and capricious, rather than review its decision de novo.

c. The Effect of Alleged Procedural Error

Winters also argues that the court must review the denial of his claim de novo because Liberty committed procedural errors that strips it of discretion. He cites cases in which courts reviewed decisions de novo because plan administrators failed to comply with regulations governing the timeline for deciding appeals. See Fessenden v. Reliance Standard Life Ins. Co., 927 F.3d 998, 1005–06 (7th Cir. 2019); LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 800 (10th Cir. 2010).[8] That is not the type of the procedural error

---

[8] At least one circuit has come to a different conclusion. See McIntyre v. Reliance Standard Life Ins. Co., 972 F.3d 955, 964-65 (8th Cir. 2020) (finding that "de novo review is not triggered in this context unless the administrator wholly fails 'to act on an appeal' and that failure 'raises serious doubts about the result reached by the plan administrator' in its initial denial" (quoting Seman v. FMC Corp. Ret. Plan for Hourly Emps., 334 F.3d 728, 733 (8th Cir. 2003)).

alleged here. Rather, Winters contends that Liberty belatedly and only partially granted his request for an extension of time to file his appeal, prematurely conducted medical reviews, and did not disclose all of the information upon which it relied to Winters. The court need not decide whether any such procedural errors would result in de novo review. As explained below, Liberty substantially complied with the regulations that Winters alleges were violated. In addition, Winters has not claimed, let alone proven, prejudice resulting from the alleged violation as required by First Circuit jurisprudence. Therefore, this court is reviewing Liberty's denial of benefits to determine whether it was arbitrary and capricious.

### 2. Full and Fair Review

Section 503 of ERISA requires employee benefit plans to "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review . . . of the decision denying the claim." 29 U.S.C. §1133(2). The provision is to be construed "[i]n accordance with regulations of the Secretary [of Labor]." Id.

A claimant making a challenge under §503 must show that he or she was prejudiced by a procedural irregularity. See DiGregorio v. Hartford Comprehensive Emp. Benefit Serv. Co., 423 F.3d 6, 16 (1st Cir. 2005); Jette v. United of Omaha Life Ins. Co., 18 F.4th 18, 32 (1st Cir. 2021); Bard, 471 F.3d at 240-41. Therefore, a claimant

23

must "demonstrate a connection between" the plan administrator's procedural failure and "her inability to receive from the plan administrator a full and fair review of her claim to benefits." DiGregorio, 423 F.3d at 16. A claimant challenging an administrator's failure to disclose an entire case file must show that "she did not understand the evidence that she had to provide to dispute [the plan administrator's] conclusion that she was not entitled to benefits." Id.

### a. Liberty's Extension of Winters' Time to File

Winters argues that he was forced to submit an incomplete appeal because Liberty delayed in responding to his request for an extension. He cites a regulation requiring plan administrators to render disability determinations within 45 days of a claimant's request for review. See 29 C.F.R. §2560.503-1(i)(1)(i), (i)(3)(i). The regulation allows for an extension of up to 45 days if there are "special circumstances," but requires the plan administrator to notify the claimant of the circumstances before the initial 45-day period ends. Id. The regulation does not establish a deadline by which the plan administrator must decide a claimant's request for an extension.

Although Winters claims that he did not receive it until May 11, 2020, Liberty's letter partially granting Winters' request for a 90-day extension is dated April 18, 2020, nine days before the April 27, 2020 deadline for Winters to file an appeal. To the

extent Winters is asserting that the extension should have been granted within 45 days, Liberty's letter is dated only 24 days after he made the request and he claims to have received the letter within 47 days.

In any event, Winters' claim that he was denied a full and fair review because Liberty belatedly and only partially granted his request for a 90-day extension fails because he has not demonstrated that he was prejudiced by that decision. Liberty considered the supplements Winters submitted in June and July 2020. AR at 87-91, 153-54. In addition, when Liberty sent Winters medical peer reviews in July 2020, it informed him that he could submit additional information through July 24, 2020. This was 88 days after Winters' original deadline to file an appeal, substantially covering the 90-day extension he requested.

Moreover, Winters has not identified or submitted to this court any evidence that he contends he would have provided to Liberty if given a few more, or many more, days to do so. Because "it may be appropriate for the court to consider 'evidence outside the administrative record' in assessing a claim of 'prejudicial procedural irregularity in the ERISA administrative review procedure,'" he could have done so. DiGregorio, 423 F.3d at 16 (quoting Orndorf, 404 F.3d at 520) (emphasis in original). Accordingly, Winters has not made the showing of prejudice that would be required if, contrary to the court's conclusion, Liberty

25

erred in not providing him a 90-day extension of time to submit his appeal. See id.; Jette, 18 F.4th at 32; Bard, 471 F.3d at 240-41.

### b. Consideration of Information Submitted by Winters

Under 29 C.F.R. §2560.503-1(h)(2)(iv), a full and fair review must "take[] into account all comments, documents, records, and other information submitted by the claimant relating to the claim" even if the information was not produced prior to the initial benefit determination.

Winters argues that Liberty erred in conducting medical reviews before his extended deadline to submit documentation. Some of the medical reviews Liberty relied on did not consider all of the medical records Winters ultimately submitted, particularly the information in his June and July 2020 submissions. The record indicates, however, that at least one reviewing physician reviewed both of Winters' supplements. AR at 87-91, 153-54. In any event, Winters fails to explain, let alone prove, how he was prejudiced by Liberty also considering the reviews that did not include the supplements in reaching its decision. Having failed to prove prejudice, Winters was not denied a full and fair hearing required by 29 C.F.R. §2560.503-1(h)(2)(iv) as a result of the way in which Liberty considered the additional supplemental information he provided. See DiGregorio, 423 F.3d at 16; Jette, 18 F.4th at 32; Bard, 471 F.3d at 240-41.

c. <u>Disclosure of Information Used in the Denial</u>

Winters also argues that he was denied a full and fair review because Liberty violated 29 C.F.R. §2560.503-1(h)(4). Under §2560.503-1(h)(4), a plan administrator must timely provide the claimant with evidence or rationales used in making the benefit determination so that he or she has a reasonable opportunity to respond. The information must be provided promptly and "sufficiently in advance" of the deadline for the plan administrator to notify the claimant of an adverse benefit determination. §2560.503-1(h)(4). However, this provision does not apply to claims filed between January 18, 2017 and April 1, 2018. 29 C.F.R. §2560.503-1(p)(4). Winters' claim was filed on January 10, 2018 and, therefore, §2560.503-1(h)(4) does not apply.

A claim filed between January 18, 2017 and April 1, 2018, such as Winters', is not fully and fairly reviewed unless the review process complies with §2560.503-1(h)(2)(ii)-(iv). 29 C.F.R. §2560.503-1(p)(4)(ii). Subsection (h)(2)(iii) requires that a "claimant shall be provided, <u>upon request</u> and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to [his or her] claim for benefits." §2560.503-1(h)(2)(iii) (emphasis added). This subsection applies to both the initial benefit determination and any appeal of an adverse benefit determination. See <u>Jette</u>, 18 F.4th at 27-28. Upon request, relevant documents must be disclosed "regardless of

27

whether it would be used to support a new reason to deny coverage."
Id. at 29.

Liberty does not dispute Winters' claim that it did not
provide him with all of the information used in denying his appeal,
including four medical peer reviews and the labor market survey.
Rather, it argues that disclosure of these items was not necessary.
See Def. Resp. to Pl. Statement of Material Facts (Dkt. No. 38)
¶¶114, 115. The July 30 and August 7, 2020 reviews and the survey
were conducted to address issues that Winters raised in July 2020
following Liberty's disclosure of some of the peer reviews. See AR
at 68-69. The August 7, 2020 review is an addendum to reviews
Winters had already received. See AR at 87-88, 151-52, 1159-66.

Winters does not claim that he requested disclosure of these
items or was denied access to them. However, it would have been
reasonable for Winters to assume that the reviews disclosed to him
in July 2020 included every review conducted and that any
additional reviews would be provided to him as well. By submitting
a letter challenging the reviews disclosed to him, Winters should
have anticipated that Liberty might conduct further reviews to
address the issues he raised and requested any such reviews.
However, the court does not find that Winters should have been
required to request additional information from Liberty.

Nevertheless, Winters again has not made the required showing
that he was prejudiced by Liberty's failure to disclose to him the

additional reports or the labor market survey. See DiGregorio, 423 F.3d at 16; Jette, 18 F.4th at 32; Bard, 471 F.3d at 240-41. As explained earlier, Winters could have provided to the court information that he would have provided Liberty if the final reports had been submitted to him. See DiGregorio, 423 F.3d at 16. Again, he has not identified any such information or explained how it might have been material to Liberty's decision to deny his claim. He also does not argue that he was unable to understand what evidence he needed to provide to dispute Liberty's finding that he was not disabled under the LTD Plan. Id. This failure to prove prejudice is fatal to Winter's contention that Liberty's failure to provide him all the information it received entitles him to de novo review of its decision to deny his claim for benefits. Id.; Jette, 18 F.4th at 32.

### 3. Reasonableness of Liberty's Decision

Under the arbitrary and capricious standard, the court must decide whether the administrator's decision was "unreasonable" or "irrational" on the record. Liston, 330 F.3d at 24. The court must uphold an administrative decision if it is "reasoned and supported by substantial evidence." Desrosiers v. Hartford Life & Accident Co., 515 F.3d 87, 92 (1st Cir. 2008) (quoting Wright v. R.R. Donnelley & Sons Co. Grp. Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005)). A reasoned decision analyzes the disability claim under the terms and definitions of the relevant plan. See McDonough v.

Aetna Life Ins. Co., 783 F.3d 374, 380 (1st Cir. 2015). When the administrator has a structural conflict of interest, as both the decisionmaker and the payor of benefits, a court may "temper the deference afforded to the claims administrator's decision." Id. at 379.

Unlike typical motions for summary judgment, the court deciding a motion for judgment on the administrative record under the arbitrary and capricious standard does not draw inferences in favor of the nonmoving party. Liston, 330 F.3d at 24; Bard, 471 F.3d at 235. Instead, doubts are typically resolved in favor of the plan administrator. Liston, 330 F.3d at 24.

After finding an administrator's decision unreasonable, courts in the First Circuit have "considerable discretion" in fashioning an appropriate remedy. Buffonge v. Prudential Ins. Co. of Am., 426 F.3d 20, 31 (1st Cir. 2005) (quoting Cook v. Liberty Life Assurance Co. of Boston, 320 F.3d 11, 24 (1st Cir. 2003)). If "[t]he problem is with the integrity of [the administrator's] decision-making process," the appropriate remedy is typically remand of the case to the administrator. Id. at 31-32. If the court finds that the administrator denied benefits to a "clearly entitled" claimant, the proper remedy is typically to award benefits to the claimant. See id. at 31.

30

### a. Substantial Evidence

"[E]vidence is 'substantial' when it is 'reasonably sufficient to support a conclusion.'" Desrosiers, 515 F.3d at 92 (quoting Wright, 402 F.3d at 74). An administrative decision supported by substantial evidence is reasonable even if contrary evidence exists. See Wright, 402 F.3d at 74. The plan administrator is not required "to accept or even to give particular weight to the opinion of a claimant's treating physician." Morales-Alejandro, 486 F.3d at 700 (citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003)).

Here, Liberty relied on substantial evidence in denying Winters' claim. This evidence included the opinions of nine independent physicians obtained in the course of the initial benefit determination and the appeal, including eight medical peer reviews and an IME.[9] The reviewers considered the medical records

---

[9] Winters challenges the physical examination component of the IME as cursory. AR at 1863. Courts have held that plan administrators are not necessarily required to conduct physical examinations. See Denmark v. Liberty Life Assur. Co. of Boston, 481 F.3d 16, 34 (1st Cir. 2007), vacated on other grounds, 566 F.3d 1 (1st Cir. 2009); Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir. 2005). Nonetheless, Dr. Patel wrote a 11-page report and reviewed voluminous medical records in addition to conducting the physical examination. See AR at 3174-84. Further, there is no expert or other evidence in the administrative record to support the allegation that the physical examination was cursory. In any event, the IME was only one piece of evidence used by Liberty in reaching its decision and is not material to the court's analysis of reasonableness.

submitted by Winters, see, e.g., AR at 91, 1204-08, and several reviewing doctors engaged in conversations with Winters' treating physicians before completing their reviews, see AR at 1160-61, 1194-95, 1211, 1213.

Multiple reviews reference Winters' physical capabilities in relation to a working environment. For example, in his August 7, 2020 review Dr. Mehta opined that Winters had full-time work capacity within certain physical restrictions and limitations. AR at 87-88. Similarly, in his May 19, 2020 review Dr. Yamini opined that Winters "requires the accommodation of frequent restroom breaks, up to 7 minutes at a time, and 1 time per hour as well as the accommodation of working within 200 yards of the restroom." AR at 137. As part of the IME, Dr. Patel specifically considered whether Winters had "sustained sedentary work capacity to perform his own occupation as a Mortgage Consultant" and made note of specific physical abilities and limitations related to that occupation. AR at 3183-84. The IME included a review of a July 2018 activities questionnaire in which Winters complained of dizziness and headaches from using the computer. AR at 3180; see also AR at 3851. Similarly, Drs. Feitelson and Yamini reviewed March 2020 records from Dr. DeLuca, making specific note of Winters' computer-related headaches. AR at 1181, 1208; see also AR at 1867.

The evidence goes beyond the physical demands identified by Liberty. Multiple medical reviews considered by Liberty specifically commented on Winters' cognitive or psychiatric functioning. For example, in his July 30, 2020 review, Dr. Shura reported that "there is no medical evidence of significant cognitive or psychiatric impairment to warrant [restrictions and limitations]." AR at 89. In her June 1, 2020 review, Dr. Feitelson reported that "[t]he information in the medical documentation does not support that the claimant is severely psychiatrically incapacitated beyond 10/29/19. . . . The reported psychiatric symptoms do not preclude functioning at work and do not translate into restrictions and limitations beyond 10/29/19." AR at 1168-69. In addition, in 2019 Winters received performance validity testing, which evaluates certain cognitive abilities. See AR at 3421-26. While the doctor conducting the testing found that some results were invalid because of Winters' "suboptimal effort," AR at 3424, the testing indicated that Winters' "reading ability, confrontation naming, visual-constructional skills, delayed memory, and novel problem solving" were normal, AR at 3421.

Winters argues that Liberty improperly denied him benefits because he does not have a diagnosis. He similarly alleges that the denial is based on a "false premise" that his claim is based on a diagnosis of Lyme disease. See Pl. Opp'n (Dkt. No. 34) at 8-11. While Liberty notes that medical professionals have been unable

33

to determine the root of his symptoms and that Winters has never been diagnosed with Lyme disease, Liberty's denial is based on medical professionals who have reviewed extensive medical records and opined on Winters' abilities, as well as a labor market survey. There is no evidence to suggest that the existence vel non of a specific diagnosis was a driving factor in reaching the denial.

However, "medical evidence is only part of the equation." McDonough, 783 F.3d at 381. The administrator must also evaluate the requirements of the occupation. Id. As discussed in detail below, Liberty conducted an occupational analysis/vocational review to identify the requirements of Winters' occupation. It also engaged Paradigm to conduct a labor market survey and gain information about the physical demands required by employers in the local economy.

Accordingly, the court finds that Liberty had substantial evidence to support its decision denying Winters' claim.

### b. Analysis of Job Requirements

An administrator's decision must also be "the product of a principled and deliberative reasoning process." See Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 124 (2008) (citation omitted); see also Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 618 (6th Cir. 2006) ("[M]edical data, without reasoning, cannot produce a logical judgment about a claimant's work ability."). If a plan defines "disabled" as being unable to perform the duties of one's

own occupation, a reasoned decision requires "a review of the material duties of the claimant's particular position and an assessment of how those duties align with the position as it is normally performed in the [relevant] economy. Only then can a claims administrator distill the medical and vocational evidence, apply it to the occupational profile, and make a reasoned determination of whether or not the claimant is disabled." McDonough, 783 F.3d at 380 (citation omitted). In other words, "[t]o assess a claimant's ability to perform his own occupation, a decisionmaker must be aware of, and apply, the requirements of the occupation." Id. at 381. A reasoned decision must consider both the physical and the cognitive demands of the occupation. See id. at 380. The duties of a claimant's own occupation may be drawn from a job description but need not be. See id. at 380-81; Elliott, 473 F.3d at 618 & n.4. For example, "a claims administrator may properly consider a position description drawn from the [Department of Labor Dictionary of Occupational Titles ("DOT")] in assessing a claim of disability as long as it involves duties comparable to those of the claimant's own job." McDonough, 783 F.3d at 380-81.

In McDonough v. Aetna Life Insurance Co., the First Circuit addressed the standard for analyzing job requirements. There, the appellant challenged the termination of his benefits under a long-term disability plan. Id. at 376. McDonough held the "high-

pressure" position of "Senior Analyst III, Systems Administration" in the information technology department of Biogen Inc., a pharmaceutical company. Id. He was responsible for providing support to all Biogen locations worldwide, at all hours of the day and night, and every day of the year. Id. McDonough sought disability benefits following "the sudden onset of right-side numbness, dizziness, and blurred vision" and a provisional stroke diagnosis. Id.

The relevant plan defined disabled as "not able to perform the material duties of [his] own occupation solely because of: disease or injury; and [his] work earnings are 80% or less of [his] adjusted predisability earnings." Id. (alterations in original). The material duties were defined as those "normally required for the performance of [the participant's] own occupation." Id. at 376-77 (alteration in original). The plan defined "own occupation" as "the occupation routinely performed by the participant at the time the disability began as that occupation is normally performed in the national economy, rather than how it is performed for the employer." Id. at 377 (internal quotation marks and alterations omitted).

McDonough began receiving long-term disability benefits and continued to experience physical and mental symptoms, including "sudden right-side weakness," loss of balance, anxiety, and panic attacks. Id. McDonough's benefits were terminated following a

report from his primary care physician that he had a "sedentary level of functionality" and was able to work a typical 40-hour work week. See id. In terminating the benefits, the claim administrator Aetna Life Insurance Company ("Aetna") discounted a report from two mental health providers that McDonough suffered from multiple "debilitating panic attacks" each week and was unable to work. Id.

McDonough appealed the termination through the Aetna's internal process, submitting medical records and a report from a vocational consultant. Id. During the appeal, Aetna engaged four, effectively internal, doctors to review McDonough's medical records and other documents. Id. The doctors found that the records did not illustrate functional or psychological impairments and did not suggest that he was unable to work "in his own sedentary level occupation." Id. at 377-78. However, "none of the reviewers discussed either the demands of [McDonough's] position as it is normally performed in the national economy or how his symptoms would affect his ability to meet those demands." Id. at 378.

Nevertheless, Aetna denied McDonough's appeal. Id. The "denial letter did not discuss, directly or indirectly, the requirements of the appellant's position as it is normally performed in the national economy." Id. McDonough challenged the decision in the federal courts. Id.

The First Circuit found that Aetna's decision to terminate McDonough's benefits was unreasonable. Id. at 380. The court explained:

> None of the four internal reviewers upon whom Aetna relied compared the appellant's symptoms or impairments to any description of the physical and cognitive demands of his own occupation as that term is defined in the plan documents. Nor does the administrative record support an inference that Aetna itself made any such comparison. While the record is rife with accounts of the appellant's medical and psychological symptoms, Aetna never took the obligatory step of assessing whether and to what extent (if at all) the appellant's impairments compromised his ability to carry out the material duties of his own occupation as normally performed in the national economy.

Id. (emphasis in original). "[P]assing references to the appellant's 'own occupation' or 'own sedentary level occupation'" were insufficient because they "were unaccompanied by any attempt to articulate the material duties of the appellant's own occupation as that occupation is normally performed in the national economy." Id. The court also noted that one reviewer appeared to ignore the occupation's cognitive demands by only mentioning McDonough's "own sedentary level occupation." Id. at n.3. Therefore, the case was remanded to Aetna for further review. See id. at 382.

The Third Circuit also addressed this issue in Miller v. American Airlines, Inc., 632 F.3d 837 (3d Cir. 2011). There, a pilot for American Airlines ("American") challenged the termination of his long-term disability benefits. Id. at 841. Miller began receiving disability benefits following a "psychotic

episode" and a finding by his psychiatrist that he "suffered brief reactive psychosis caused by physical fatigue, sleep deprivation, and emotional stress." Id. at 841-42. The relevant plan defined disability as "an illness or injury verified through a qualified medical authority . . . which prevents a Member from continuing to act as an Active Pilot Employee in the Service of the Employer." Id. at 842 (alteration in original). It was considered an "own occupation" plan because the disability inquiry focused on whether claimants could perform as pilots, regardless of whether they had the capacity to work in another occupation. See id.

After several years, American terminated Miller's benefits because it could not verify his disability. Id. The benefits were reinstated following a submission from Miller's psychiatrist. Id. Several years later, Miller's benefits were terminated again because American was "unable to verify either the existence of a continuing medical disability or [Miller's] continued substantial progress towards obtaining [his] FAA medical certification." Id. at 842-43. Notably, the plan did not require claimants to have or pursue a medical certification in order to receive disability benefits. Id. at 843.

Miller appealed the termination through the plan administrator's internal process, submitting a letter from his psychiatrist stating that he was "continually and [ ] permanently disabled." Id. (alteration in original). As part of the appeal,

American referred the Miller's file for an outside review performed
by two doctors. Id. One doctor found that Miller was not disabled
because his records did not establish psychiatric problems or
address his failure to obtain the medical certification. Id. at
843-44. The other doctor found that Miller was not disabled because
he was not receiving psychotherapy or taking medication and because
he had not attempted to obtain the medical certification. Id. at
844. After receiving these reports, American affirmed the
termination. Id. Miller challenged the decision in federal court.
Id.

The Third Circuit found that American failed "to reconcile
the demanding job requirements of a commercial pilot with Miller's
continuing anxiety and risk that he would experience a recurring
psychotic episode." Id. at 856. More specifically, neither the
termination letter nor the external medical review "provided any
explanation of how he could perform the essential duties of . . .
a pilot." Id. at 855. The medical reviewers did receive a copy of
the American job description and "a list of essential functions."
Id. The job description dictated that pilots must "be able to work
varying hours of the day or night," make decisions under stress,
and "adapt to diversified flight schedules, situations, or
scenarios." Id. The court noted an "incongruity" in one doctor's
opinion that Miller was not disabled while recognizing that he
"was at risk of having another psychotic episode if he was exposed

40

to physical fatigue, sleep deprivation, and emotional stress." Id. Combined with other "procedural irregularities and substantive errors," this failure made American's decision arbitrary and capricious. Id. at 856.

### 1. Occupational Review

Here, the occupational analysis/vocational review performed by Liberty categorizes Winters' occupation and identifies the key duties and physical requirements of the occupation. See AR at 3537- 40. It does not include discussion about Winters' medical condition or draw conclusions about his capabilities. See id.

The review recites the Wells Fargo Mortgage Consultant job description. See AR at 3537. Liberty's vocational expert found that the job of Mortgage Consultant most closely aligned with the occupation of "Sales Representative, Financial Services" under the Department of Labor's DOT, "Sales Agents, Financial Services" under the Occupational Information Network/Standard Occupational Classification ("O*NET/SOC") coding system, and "Securities, Commodities, and Financial Services Sales Agents" under the Occupational Outlook Handbook. AR at 3538. The review does not explain why these positions align best with Winters' position. See McDonough, 783 F.3d at 381.

The review includes sample job titles and the following list of duties, both taken from the O*NET:

- Sell financial services, such as loan, tax, and securities counseling to customers of financial institutions and business establishments. . . .
- Determine customers' financial services needs and prepare proposals to sell services that address these needs.
- Prepare forms or agreements to complete sales.
- Sell services or equipment, such as trusts, investments, or check processing services.
- Contact prospective customers to present information and explain available services.
- Develop prospects from current commercial customers, referral leads, or sales or trade meetings.
- Evaluate costs and revenue of agreements to determine continued profitability.
- Review business trends to advise customers regarding expected fluctuations.
- Make presentations on financial services to groups to attract new clients.

AR at 3538. Neither the appeal decision letter nor the original denial letter discuss these duties. However, the appeal letter states that the occupation requires "use [of] standard office equipment, computer, printer, fax machine, and a telephone." AR at 63.

Liberty's vocational expert found that Winters' "occupation is most often performed at a sedentary to light level of physical demand." AR at 3538. In identifying the relevant physical duties, Liberty relied on the physical requirements for sedentary work and light work as defined by the Department of Labor. See AR at 3538-39; AR at 3015.

Sedentary work requires:

Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of

42

> the time) and/or a negligible amount of force frequently
> (Frequently: activity or condition exists from 1/3 to
> 2/3 of the time) to lift, carry, push, pull, or otherwise
> move objects, including the human body. Sedentary work
> involves sitting most of the time, but may involve
> walking or standing for brief periods of time. Jobs are
> sedentary if walking and standing are required only
> occasionally and all other sedentary criteria are met.

AR at 3538-39. It is marked by the following positional requirements: "frequent and constant sitting," "frequent handling and fingering," "occasional standing, walking and reaching," and "no balancing, bending/stooping, twisting, kneeling, crouching/squatting, crawling, climbing." Id. at 3539.

> Light work requires:
>
> Exerting up to 20 pounds of force occasionally, and/or
> up to 10 pounds of force frequently, and/or a negligible
> amount of force constantly (Constantly: activity or
> condition exists 2/3 or more of the time) to move
> objects. Physical demand requirements are in excess of
> those for Sedentary Work. Even though the weight lifted
> may be only a negligible amount, a job should be rated
> Light Work: (1) when it requires walking or standing to
> a significant degree; or (2) when it requires sitting
> most of the time but entails pushing and/or pulling of
> arm or leg controls; and/or (3) when the job requires
> working at a production rate pace entailing the constant
> pushing and/or pulling of materials even though the
> weight of those materials is negligible. NOTE: The
> constant stress and strain of maintaining a production
> rate pace, especially in an industrial setting, can be
> and is physically demanding of a worker even though the
> amount of force exerted is negligible.

Id. It is marked by the following positional requirements: "frequent sitting, standing, walking, handling, and fingering," "occasional bending/stooping, twisting, crouching/squatting, kneeling and reaching," and "no balancing, crawling or climbing."

43

Id. Both the appeal letter and the denial letter discuss the physical requirements of sedentary and light work. AR at 63, 3015.

The duties and requirements as defined by the occupational analysis/vocational review do not include driving. See AR at 3538-39. They also do not address the quality of work required for this position. See id. This contrasts with the Wells Fargo job description, which requires driving to realtor offices and banks, "produc[ing] high quality loans," and "providing excellent customer service." AR at 4066-67.

The occupational analysis/vocational review identifies the local economy as the "Connecticut NonMetropolitan Division." AR at 3539. It states that the Department of Labor does not have data for financial services sales agents in that economy. Id. Doing an online search, the vocational expert identified five national employers with locations in the local economy. Id. The expert reviewed job openings, concluded that the related job responsibilities were "reflective of those reported by the DOT, O*NET, and OOH," and concluded that Winters' occupation is performed in the local economy in the same manner that it is in the national economy. AR at 3539-40.

### 2. Medical Reviews

Unlike the occupational analysis/vocational review, the appeal decision and denial letters refer to the medical reviews and make conclusions about Winters' ability to perform his own

44

occupation. They include excerpts from the medical reviews that discuss Winters' ability to fulfill his work duties, focusing on the physical requirements associated with sedentary work. Liberty gave questions regarding these physical demands to the reviewing physicians to guide their medical reviews. See, e.g., AR at 3590, 3699-3700, 3705.

In the IME, Dr. Patel opined that Winters "does have sustained sedentary work capacity to perform his own occupation as a Mortgage Consultant and is able to meet the demand levels outlined in the job description provided." AR at 62, 3183. Dr. Patel then goes on to list physical limitations and restrictions that Winters has, including how long he can sit, walk, and stand, and how much he can lift. AR at 62-63, 3183. Dr. Patel does not address any of the non-physical requirements identified by the vocational expert, like communicating with customers, preparing presentations and proposals, and reviewing business trends, or functional requirements, like looking at a computer screen all day. See AR at 3174-84.

Similarly, the denial letter includes an excerpt from Dr. Mehta, who concluded that Winters had various physical restrictions and limitations but that he had "sustained capacity for full-time work in various occupations (as determined by voc) within [those restrictions and limitations]." AR at 69, 88. Dr.

Mehta also did not address the non-physical requirements of the occupation. See AR at 87-88, 151-52, 1159-66.

The appeal decision also includes medical review excerpts that address Winters' cognitive abilities. For example, it includes Dr. Shura's conclusion that "[m]ental status exams . . . over time do not indicate a consistent pattern of moderate to severe cognitive impairments." AR at 67, 91. Dr. Shura found that Winters had "intact recent and remote memory, appropriate fund of knowledge, and appropriate attention and concentration." AR at 68, 89. He made other findings, including that Winters' "anxiety symptoms are not impairing." AR at 69, 89. However, Dr. Shura did not take the next step of comparing Winters' cognitive abilities to the job duties identified by the vocational expert. See AR at 89-91, 1186-1203.

The denial similarly includes Dr. Feitelson's conclusion that the record does not support work restrictions and limitations for Winters, based in part on the finding that "[n]europsychological testing did not show deficits consistent with complaints." AR at 68, 1169. Dr. Feitelson found that Winters' "symptoms of anxiety and reactive emotions are not in the range of severity that would explain Mr. Winters' lack of stamina and reported cognitive problems." AR at 67, 1169. However, Dr. Feitelson also did not draw any comparisons between her assessment of Winters'

46

capabilities and the job duties identified by the vocational expert. See AR at 1167-83.

### 3. Labor Market Survey

Liberty also relied on a labor market survey in denying Winters' appeal. AR at 69-70. The survey, conducted by Paradigm, asked ten local employers fourteen questions. AR at 74-77. All fourteen questions[10] related to the physical requirements associated with positions within the occupation of Sales Representative, Financial Services. Id. In fact, the survey explicitly states that the "employers were contacted to discuss the physical demands" of the positions. AR at 74. For each position, however, the survey lists job duties and requirements. See AR at 74-77. These duties and requirements vary but include assisting customers with investments, ensuring compliance with laws and regulations, growing business through referrals, and meeting with clients to assess financial needs. See id. They also include computer, interpersonal, problem solving, relationship building, and customer service skills. See id.

Liberty summarized the survey in a report, which focuses on the employers' answers to the questions about physical demands. AR

---

[10] One of the questions asked how much driving was required. Seven of the employers did not require driving, two required occasional driving, and one required frequent driving. AR at 80. Therefore, Liberty found that driving was not a requirement of the occupation. Id.

47

at 78-80. It did not address the duties and responsibilities
identified by the survey. Id. Liberty concluded that "jobs within
[Winters'] occupations were overwhelming sedentary." AR at 80.
This conclusion was reiterated in the denial letter, which also
only addressed the survey's findings on physical demands. AR at
70.

### 4. Liberty's Decision

Both parties agree that Winters has symptoms that constitute
a "Sickness" within the meaning of the LTD Plan. See Def. Opp'n
(Dkt. No. 37) at 10 n.10. Winters has a documented history of
chronic fatigue syndrome and headaches, among other problems. See,
e.g., AR at 1876, 3182-83, 3271. However, "[b]ased on the
information contained in his file," Liberty concluded that Winters
"would be capable of performing the duties of his own occupation."
AR at 70. Liberty went on to state that there was no "medical
evidence substantiating that his symptoms remained of such
severity that they resulted in restrictions or limitations
rendering him unable to perform the duties of his occupation." Id.

Liberty reached this conclusion after engaging nine
independent doctors, at least two vocational experts, and a company
to perform a labor market survey. Despite the substantial evidence
Liberty relied upon, Liberty's decision suffers from a fatal flaw.
Specifically, it failed to complete "a review of the material
duties of [Winter's] particular position and an assessment of how

those duties align with the position as it is normally performed in the [local] economy." McDonough, 783 F.3d at 380.

The vocational review portions of both the letter terminating Winters' benefits and the letter denying Winters' appeal focus on the physical demands generally associated with "sedentary" or "light physical" work. See AR at 63, 69-70, 3014-16. Liberty gave questions regarding these physical demands to the reviewing physicians to guide their medical reviews. See, e.g., AR at 3590, 3699-3700, 3705. These physical demands also formed the basis of the questions asked in the labor market survey. See AR at 74. In fact, all fourteen questions asked in the survey relate to physical demands. Id.

The relevant question, however, is not whether Winters is able to perform sedentary or light physical work. The proper inquiry is whether is he able to perform the Substantial and Material Duties of his Own Occupation - his "particular position" as a Mortgage Consultant or Financial Services Sales Agent. See McDonough, 783 F.3d at 380. The LTD Plan defines these duties as "responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified." AR at 4348. Physical requirements associated with an occupation are one component of the inquiry. For example, if an occupation requires heavy lifting or constant walking and an individual cannot lift or walk for long

49

periods of time, the individual would be unable to perform the duties of that occupation. Liberty completed this analysis, finding that Winters can meet the physical demands of sedentary or light physical work. However, this is only part of the inquiry.

Liberty was also required to assess whether Winters' Sickness prevented him from performing non-physical duties, like preparing presentations and proposals, engaging with customers, and business development. See AR at 3538. In its occupational analysis/vocational review, Liberty recites the Wells Fargo job description and identifies non-physical duties of Winters' Own Occupation, but that is the extent of Liberty's engagement on the topic. The doctors do not appear to have considered these duties in their reviews. These duties are also not analyzed in the denial letters or as part of the labor market survey.

Some of the medical reviews discuss Winters' cognitive abilities, and it is possible that a reasoned decision could be reached based on these opinions. However, such a reasoned decision is not apparent from the administrative record. Neither the doctors nor Liberty "took the obligatory step" of comparing the findings in the medical reviews and the non-physical duties identified by the vocational expert or found in the Wells Fargo job description. See McDonough, 783 F.3d at 380.

Liberty argues that "consulting physicians, like treating physicians, are not vocational experts." Def. Opp'n at 16. The

court does not mean to imply that it believes the doctors are required to make conclusions about whether a claimant is disabled. It simply notes that the doctors reviewing Winters' file did not address how their assessment of Winters' limitations or lack of limitations impacted his ability to meet the job requirements identified by the vocational expert. It was insufficient for Liberty to rely on blanket statements from the doctors that restrictions and limitations are not supported by the record without addressing the duties Winters was called upon to perform. Instead, Liberty was required to analyze how the medical assessments compared to the job requirements. For example, Liberty could and should have made conclusions about Winters' ability to engage with customers based on medical assessments of his attention span and ability to concentrate, see AR at 68, among other cognitive abilities.

Liberty also does not take the next step of analyzing "how those duties align with the position as it is normally performed in the [local] economy." McDonough, 783 F.3d at 380. The denial letters do not discuss how non-physical demands – defined by the Wells Fargo job description, Liberty's vocational expert, or otherwise – match up to the job duties and requirements found in the labor market survey. Instead, Liberty focused solely on physical demands, determining that the occupation is performed at a sedentary level in the local economy.

In essence, Liberty performed an analysis that would apply equally to any occupation that is commonly performed at sedentary or light physical demand levels. Therefore, Liberty improperly conflated Winters' Own Occupation with general sedentary or light work. See id. at 380 & n.3; Elliott, 473 F.3d at 618 n.3. As such, Liberty did not properly "distill the medical and vocational evidence, apply it to the occupational profile, and make a reasoned determination of whether or not [Winters] is disabled." McDonough, 783 F.3d at 380.

Again, it is possible that the evidence that Liberty relied upon is sufficient to support its position that Winters can perform the duties of a Mortgage Consultant or Financial Services Sales Agent. The court has highlighted medical reviews that discussed Winters' cognitive functioning in addition to his physical limitations. The labor market survey also includes information about non-physical duties at other employers in the local economy. AR at 74-77. However, if Liberty completed the analysis it was required to make to support its decision in denying Winters' claim, it is not apparent from the administrative record, and was not communicated to Winters in Liberty's decision letters. Therefore, its decision was unreasonable.

Winters argues that Liberty was unreasonable in failing to provide his job description to some of the reviewing doctors. See Pl. Mem. (Dkt. No. 26) at 14-15. He also argues that they did not

consider "the material and substantial duties of any other position in the business and legal field." Id. at 16. For the reasons described below, the court finds these contentions unpersuasive.

Winters' job description is not the proper focus of the inquiry. The question is whether Winters could perform the Material and Substantial Duties of his Own Occupation, rather than the duties of his particular position at Wells Fargo. Although the job description could have formed the basis of the Material and Substantial Duties of Winters' Own Occupation, Liberty was permitted to, and did, draw on other sources like the DOT. See McDonough, 783 F.3d at 381. Nevertheless, the record indicates that both Drs. Feitelson and Shura reviewed Winters' job description in the course of their reviews. AR at 1177, 1191. Dr. Shura's review notes that the job required "customer interaction." AR at 1191. During the IME, Dr. Patel also reviewed the job description and opined that Winters "does have sustained sedentary work capacity to perform his own occupation as a Mortgage Consultant and is able to meet the demand levels outlined in the job description provided." AR at 3176, 3183. Therefore, the record indicates that the job description was reviewed by at least three doctors, and Liberty's decision was not deficient for this reason.

Furthermore, Winters' argument about the duties of other occupations in the business and legal fields is misplaced. As discussed earlier, because he was in the first 24 months of

53

Disability at the time his benefits were terminated, Winters' claim must be analyzed by his Own Occupation of Mortgage Consultant, rather than Any Occupation. Accordingly, Liberty was not required to consider the duties of other business or legal positions.

*    *    *

Liberty has failed to explain fully or adequately its theory of how Winters will be able to carry out all of the Material and Substantial Duties of his Own Occupation, particularly the non-physical duties. Instead, Liberty completed only an analysis of whether Winters could perform sedentary or light work. Therefore, its decision was unreasonable. See McDonough, 783 F.3d at 380 & n.3.

### c. Structural Conflict of Interest

Finally, "if a court concludes there is an improper motivation amounting to a conflict of interest, the court 'may cede a diminished degree of deference - or no deference at all - to the administrator's determinations.'" Wright, 402 F.3d at 74 (citing Leahy, 315 F.3d at 16). An administrators "dual role" as both the decisionmaker and the payor of benefits may constitute a structural conflict of interest and should be considered "as a factor in determining whether the plan administrator has abused its discretion in denying benefits." Glenn, 554 U.S. at 108.

As discussed earlier, Liberty has a structural conflict of interest. Winters argues that Liberty has failed to take measures

to reduce potential bias and promote accuracy in evaluating claims. See Pl. Mem. at 20. He notes that Dr. Patel has performed multiple evaluations for Liberty and argues that he may have an "incentive" to make findings favorable to Liberty. Id.

However, the Tom Declaration[11] details Liberty's various procedural safeguards. For example, Liberty's claims department and appeals unit are separate and independent from each other and other departments. See Tom Declaration ¶¶3, 4. In addition, Liberty does not directly select, hire, or pay the doctors who review claimants' medical records and perform IMEs. Id. ¶¶9, 12. Reviews of claimants' medical records and IMEs are coordinated through third-party vendors compensated per prior arrangements. Id. If a vendor is used during the original benefit determination, a different vendor is engaged on appeal. Id. ¶11.

The court finds these are meaningful safeguards that reduce the risk that Liberty's structural conflict resulted in biased decision-making. Therefore, the court has decided not to "temper the deference afforded" to Liberty. See McDonough, 783 F.3d at 379. Nevertheless, for the reasons previously explained, the court finds that Liberty was unreasonable in denying Winters' benefits

---

[11] For reasons previously described in denying Winters' motion to strike, the court finds that the Tom Declaration is reliable evidence.

and is denying Liberty's motion for a judgment on the administrative record.

### 4. Winters' Burden

While the court finds that Liberty was unreasonable in reaching its decision to deny Winters' benefits, it does not find that the resulting decision was necessarily wrong. As discussed, the burden falls on Winters to prove that he is disabled within the meaning of the LTD Plan. See, e.g., Orndorf, 404 F.3d at 518-19; Morales-Alejandro, 486 F.3d at 700. The court finds that Winters has not met his burden.

Winters does present countervailing evidence. He primarily relies on Dr. DeLuca who has opined at least three times that Winters is disabled and/or unable to work. However, Dr. DeLuca also agreed with a summary of the IME that stated "[t]he claimant does have sustained sedentary work capacity to perform his own occupation as Mortgage Consultant and is able to meet the demand levels outlined in the job description provided."[12] AR at 3033-35. Dr. DeLuca also indicated to Dr. Yamini in May 2020 that he was "not able to clearly address claimant's functional status." AR at

---

[12] Winters attempts to minimize this fact by highlighting that the Dr. DeLuca opined that he was disabled and unable to work both before and after this agreement and by arguing that the agreement was limited to the IME's characterization of a chronic fatigue diagnosis and Winters' physical limitations. However, the court finds that it was reasonable for Liberty to consider Dr. DeLuca's agreement with the IME's conclusions about Winters' work capacity.

1211, 1213. Further, Dr. DeLuca's opinions do not address the Material and Substantial Duties of Winters' Own Occupation, as defined by Liberty or otherwise. See AR at 1867, 1876, 3727.

Dr. DeLuca's opinions do rely, in part, on Winters' inability to drive. See AR at 1867, 1876. Similarly, Winters relies on Dr. Sanamandra who opined that Winters' work capacity was restricted by his limitations in driving. See AR at 3589-90 (recounting Dr. Seth Stoller's discussions with Dr. Sanamandra). However, Liberty reasonably concluded, based on the labor market survey, that driving was not a requirement of Winters' Own Occupation as it is normally performed in the local economy.

Winters also relies on Dr. Porzio, who opined that his symptoms are "debilitating" and his "ability to work and live a normal lifestyle has significantly declined." AR at 1958. This opinion also does not address the Material and Substantial Duties of Winters' Own Occupation. See id.

The evidence Winters submitted may have provided a reasonable basis for Liberty to conclude that he was disabled within the meaning of the LTD Plan. Liberty, however, also had substantial evidence on which to conclude that he was not disabled within the meaning of the LTD Plan. The court is not drawing inferences in favor of Winters because doubts should be resolved in favor of Liberty. See Liston, 330 F.3d at 24. Further, Liberty was not required to accept the opinions of Winters' own treating physicians

or grant them any special weight in making its decision. See Morales-Alejandro, 486 F.3d at 700. Liberty's decision was not unreasonable simply because evidence exists in the administrative record to support Winters' claim. Therefore, the court finds on this record that Winters has not proven that he is disabled within the meaning of the LTD Plan.

Accordingly, the court is denying Winters' motion for summary judgment. Because the court's finding that Liberty's decision was unreasonable is based on flaws in its decision-making process and not based on a finding that Winters is "clearly entitled" to benefits, the court is remanding this case to Liberty for further proceedings. See Buffonge, 426 F.3d at 31-32.

VII. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Winters' Motion to Strike Exhibits 1 and 2 of Defendant's Statement of Material Facts in Support of Its Motion for Judgment on the Administrative Record (Dkt. No. 36) is DENIED.

2. Winters' Motion for Summary Judgment (Dkt. No. 25) is DENIED.

3. Liberty's Motion for Judgment on the Administrative Record (Dkt. No. 29) is DENIED.

4. The case is REMANDED to Liberty for further proceedings consistent with this Memorandum and Order.

UNITED STATES DISTRICT JUDGE